UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DON HANDAL, individually and as trustee of the Don Handal Revocable Trust, and HEATHER DAVIES, individually as trustee of the Stone Family Trusts, and on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) | |
| Plaintiffs, | ) | CIVIL ACTION NO. 12-10069-NMG |
| v. | ) ) | |
| STATE STREET BANK AND TRUST COMPANY, | ) ) ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION
ON DEFENDANT'S MOTION TO DISMISS**

December 27, 2012

DEIN, U.S.M.J.

## I.  INTRODUCTION

This putative class action arises out of four Custody Account Agreements which

the plaintiffs, Don Handal, individually and as trustee of the Don Handal Revocable Trust

("Handal"), and Heather Davies, individually as trustee of the Stone Family Trusts

("Davies"), entered into with defendant State Street Bank and Trust Company ("State

Street") and its predecessor, Investors Bank and Trust ("IBT").  Pursuant to the Agree-

ments, the plaintiffs authorized IBT and State Street to establish and maintain custody

accounts for the purpose of holding and disposing of cash and investments belonging to

the plaintiffs, and to perform certain transactions in accordance with instructions from the plaintiffs' investment advisor, TAG Virgin Islands, Inc. ("TAG").

The plaintiffs claim that during the time they maintained custody accounts with the defendant and its predecessor, TAG, acting without the plaintiffs' knowledge or authority, divested its clients' holdings in conservative, low-risk assets and invested their funds in illegitimate, highly speculative and illiquid investments. The plaintiffs contend that TAG's deceptive practices should have been apparent to State Street. However, they claim that rather than alerting its custodial clients to TAG's improper conduct and safe-guarding the plaintiffs' property as the defendant was required to do in its capacity as a custodian, State Street acted with gross negligence and/or willful misconduct, in violation of its contractual and legal duties, by processing fake subordinated notes created by TAG, issuing misleading and inaccurate account statements, improperly executing and settling account transactions, improperly selecting and monitoring its sub-custodians, and failing to track the location of custodial assets. According to the plaintiffs, State Street's alleged misconduct gave the appearance of legitimacy to TAG's unscrupulous behavior, and concealed TAG's fraudulent investment activities. They further assert that they have suffered millions of dollars in damages as a direct result of State Street's actions.

The plaintiffs have asserted various state law claims against State Street on behalf of themselves and other similarly situated individuals (the "Class") who had custodial accounts at State Street with investment accounts managed by TAG. In particular, by their Consolidated Class Action Complaint, the plaintiffs are seeking to hold State Street

liable for breach of contract (Count I), gross negligence (Count II), violations of Mass. Gen. Laws c. 93A (Count III), negligent misrepresentation (Count IV), breach of fiduciary duty (Count V), aiding and abetting a breach of fiduciary duty (Count VI), and unjust enrichment (Count VII).

The matter is presently before the court on "Defendant State Street Bank and Trust Company's Motion to Dismiss Plaintiff's Complaint" (Docket No. 22), by which State Street is seeking an order dismissing each Count of the Complaint for failure to state a claim pursuant to Fed. R. Civ. P. 8(a) and 12(b)(6).  While State Street's motion attacks each of the plaintiffs' claims individually, the defendant presents two arguments that apply to all Counts of the complaint.  First, State Street argues that the complaint should be dismissed in its entirety because the plaintiffs have failed to meet the pleading requirements of Fed. R. Civ. P. 8(a)(2), and second, it argues that all of the claims must be dismissed because they are barred by the Securities Litigation Uniform Standards Act ("SLUSA").  While this court finds that the plaintiffs' allegations are more than sufficient to satisfy the relevant pleading requirements, as detailed below, this court agrees that SLUSA precludes all of the plaintiffs' claims in this action.  Because SLUSA is dispositive of the entire case, this court recommends to the District Judge to whom this case is assigned that State Street's motion to dismiss be ALLOWED without prejudice.[1]

---

[1]  In light of this recommendation, this court will not address the defendant's challenges to the individual counts at this time.  Since it is not clear that the plaintiffs will be unable to plead a claim under the federal securities laws, this court recommends that the dismissal be without prejudice.

## II.  STATEMENT OF FACTS

When ruling on a motion to dismiss brought under Fed. R. Civ. P. 12(b)(6), the court must accept as true all well-pleaded facts, and give the plaintiff the benefit of all reasonable inferences.  See Cooperman v. Individual, Inc., 171 F.3d 43, 46 (1st Cir. 1999).  "Ordinarily, a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment."  Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co., 267 F.3d 30, 33 (1st Cir. 2001).  "There is, however, a narrow exception 'for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint.'"  Id. (quoting Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993)).  Applying this standard to the instant case, the facts relevant to State Street's motion to dismiss are as follows.[2]

### The Parties

Plaintiff Handal is an individual who resides in Connecticut and serves as the trustee of the Don Handal Revocable Trust ("Handal Trust").  (Compl. ¶ 9).  Handal

---

[2]  The facts are derived from (1) the Consolidated Class Action Complaint (Docket No. 20) ("Compl.") and the exhibits attached thereto ("Compl. Ex. __"); (2) the exhibits attached to the Declaration of Laura R. Gerber in Support of Plaintiffs' Opposition to Defendant's Motion to Dismiss (Docket No. 27) ("Pl. Ex. __"); (3) the exhibits attached to the Declaration of Miranda Hooker, Esq. ("Def. Ex. __"); and (4) the exhibits attached to the Supplemental Declaration of Miranda Hooker, Esq., which is attached to the defendant's Reply memorandum (Docket No. 31) ("Def. Supp. Ex. __").

claims that he has sustained at least $1.5 million in losses as a result of the conduct complained of in this action.  (Id.).  Plaintiff Davies is an individual who resides in Virginia and serves as the trustee for the Stone Family Trusts.  (Id. ¶ 10).  The Stone Family Trusts consist of the Margaret S. Stone Living Trust and the Margaret S. Stone GST Exempt Marital Trust.  (Id.).  Davies alleges that collectively, the Trusts have suffered at least $1 million in losses as a direct result of State Street's unlawful actions. (Id.).

The defendant, State Street, is a trust company that is organized under the laws of the Commonwealth of Massachusetts and maintains a principal place of business in Boston, Massachusetts.  (Id. ¶ 11).  It is the successor-in-interest to IBT, which State Street acquired in 2007.  (Id. ¶ 12).  Upon its acquisition of IBT, State Street allegedly assumed IBT's responsibilities as custodian of the plaintiffs' custodial accounts with IBT. (See id.).  The plaintiffs claim that State Street, as the successor-in-interest to IBT, is liable for IBT's misconduct, as well as its for own misconduct, with respect to the plaintiffs' accounts.  (Id.).

## Plaintiffs' Retention of State Street as Their Custodian

TAG was founded in 1985 by James Tagliaferri ("Tagliaferri").[3]  (Id. ¶ 20).  At all times relevant to this action, Tagliaferri was the President of the company and his wife,

---

[3]  Prior to 2007, TAG was known as Taurus Advisory Group.  (See Compl. ¶ 23). Because the name change is irrelevant to the issues raised by the motion to dismiss, this court has referred to that entity as "TAG" throughout this Report and Recommendation.

Patricia Cornell, was its Managing Director.  (Id.).  Allegedly, TAG filed for Chapter 7 bankruptcy protection on March 21, 2012, subsequent to the filing of this action.  (Id.).

Handal and the Handal Trust hired TAG as their investment manager in or around 2000, and the Stone Family Trusts hired TAG as their investment manager in or around 2002.  (Id. ¶¶ 17-18).  Additionally, according to the plaintiffs, TAG has provided invest-ment management services to members of the proposed Class for at least a decade.  (Id. ¶ 19).  TAG managed its clients' assets pursuant to Investment Management Agreements, which required that all investment transactions be carried out through a custodian desig-nated by the client.  (Id. ¶ 21).  At the direction of Tagliaferri and TAG, the plaintiffs and the proposed Class members retained IBT and later State Street (after its acquisition of IBT) to serve as custodian for their TAG-managed investment accounts.  (Id. ¶ 22).

The plaintiffs claim that their retention of a custodian was consistent with Securities and Exchange Commission ("SEC") Rule 206(4)-2, 17 C.F.R. § 275.206(4)-2, which requires that investment advisors such as TAG use a qualified custodian to hold client funds and securities.  (Id. ¶ 28).  Pursuant to the Rule, the custodian must maintain the funds or securities in an account under the client's name or under the name of the investment advisor as agent or trustee for the client.  (Id.; see also 17 C.F.R. § 275.206(4)-2).  Furthermore, under one of the Rule's provisions, the custodian must provide periodic account statements to the client identifying the assets in its custody or in the custody of its sub-custodians.  (Id.).  The plaintiffs allege that the purpose of this provision is to maintain the integrity of the account statements.  (Compl. ¶ 28).

According to the plaintiffs, clients retain custodian banks such as State Street in order to maintain an arm's length relationship between their assets and investment managers such as TAG.  (Id. ¶ 29).  The alleged role of such banks is to safeguard and record the movement of their clients' assets by holding the assets in safekeeping, providing appropriate valuations of assets in their custody, administering corporate actions for securities, maintaining and managing all cash transactions, including foreign currency transactions, and arranging for the "settlement" of all purchases and sales of securities – that is, the delivery and receipt of securities against an agreed upon amount of cash.  (Id.).  In addition, custodian banks are responsible for providing their clients with regular reports of all transactions that have occurred in their custodial accounts.  (Id.).

State Street advertises its own custodial services on its website, where it empha-sizes its ability to provide "world-class custody and recordkeeping of assets through our relationship with local depositories, subcustodians and agent banks," and promotes the quality of its network management and information services, and the strength of its reporting capabilities, including its ability to provide clients "with real-time views into the details of . . . custody transactions, including trade status, asset positions, cash fore-casting, intraday cash reporting and daily and monthly priced holdings[.]"  (Id. ¶ 30).  Moreover, State Street has issued various reports and publications in which it has described its custodial services and the role of a custodian bank.  (Id. ¶ 31).  In one of those publications, State Street allegedly defined "custody" to mean the "safekeeping of assets", and described the role of a custodian as "an agent . . . which receives, delivers,

and safekeeps cash and securities for its clients" and is "responsible for the maintenance of the securities while they are under custody." (Id.).  As of 2011, State Street held approximately $16.8 trillion of assets in custody, and was the third largest provider of custodial services in the world.  (Id. ¶ 30).  However, the plaintiffs allege that in their case, State Street failed to safeguard their assets, in derogation of its most basic duties as a custodian.  (Id. ¶ 5).

### The Custody Account Agreements

The relationship between the parties was formalized in a series of contractual agreements (the "Custody Account Agreements") under which IBT and State Street agreed to provide custodial services to the plaintiffs in connection with their TAG-managed investment accounts.  (Id. ¶¶ 34-35).  Although it is not necessary to describe the details of those Agreements for purposes of this Report and Recommendation, as a general matter, under the Custody Account Agreements the plaintiffs authorized IBT and State Street to establish custody accounts for the purpose of holding and disposing of property that IBT and State Street received for the plaintiffs.  (See id. ¶ 38; Pl. Ex. A at 1; Pl. Ex. C at 12).[4]  They also authorized IBT and State Street to perform various tasks, including but not limited to, the transmittal of orders to purchase and sell investments for

---

[4] Although the Custody Account Agreements that the plaintiffs entered into with IBT are not identical, they are the same in all material respects.  (See generally Pl. Exs. A through B).  Therefore, for ease of reference, this court has cited only to the Custody Account Agreement between IBT and the Handal Trust when describing the plaintiffs' contracts with IBT.  That Agreement can be found at Pl. Ex. A. The Custody Account Agreement between State Street and the Handal Trust, which differs from the IBT Agreements, can be found at Pl. Ex. C.

the custody accounts in accordance with instructions from TAG.  (<u>See</u> Compl. ¶ 39; Pl. Ex. A ¶¶ 2(g), 23; Pl. Ex. C at 9, 12).  In addition, under the Custody Account Agreements, IBT and State Street were required to issue periodic account statements describing the transactions in the custody accounts, as well as the market value of the assets contained in those accounts.  (<u>See</u> Compl. ¶ 40; Pl. Ex. A ¶ 15; Pl. Ex. C at 9, 12, 16). As described below, the plaintiffs claim that State Street issued account statements containing misleading descriptions of the transactions that had occurred in their accounts, and improper valuations of the securities and other assets in those accounts.

The Custody Account Agreements set forth express limitations on State Street's liability to the custody account holder.  In particular, the Agreements between IBT and the plaintiffs contained a provision entitled "Instructions of the Undersigned," which provided in relevant part as follows:

> You [IBT] shall incur no liability to the undersigned or otherwise as a result of any act or omission by you in accordance with instructions on which you are authorized to rely pursuant to the provisions of this section unless your reliance is the result of your gross negligence or willful misconduct.

(Pl. Ex. A ¶ 13).  They also contained a provision relating to "Liability and Indemnification," which included the following limitations on the custodian's liability:

> You [IBT] shall not be liable to any of the undersigned for any loss suffered by the undersigned (including reasonable attorney's fees) in connection with, arising out of, or in any way related to the transactions contemplated under this Agreement, unless such loss is caused by your gross negligence or willful misconduct....

(Id. ¶ 16(B)).  Similarly, the Custody Account Agreement between State Street and the

Handal Trust contained a provision entitled "Standard of Care," which read in relevant

part as follows:

> State Street shall at all times exercise reasonable care and act in good
> faith in the performance of its duties under the Agreement, taking
> into account the laws, customs, and facts and circumstances
> prevailing in the jurisdictions in which Customer elects to invest;
> provided, however, that State Street shall not be liable to the
> Customer for any Damages arising under or in connection with the
> Agreement unless caused by State Street's own fraud, gross
> negligence or willful misconduct in the discharge of its duties ....

(Pl. Ex. C at 17 (emphasis in original)).  Although the plaintiffs acknowledge these

limitations, as detailed below, they nevertheless claim that the defendant breached its

obligations under the Custody Account Agreements by acting with gross negligence

and/or willful misconduct in carrying out its custodial responsibilities.  (Compl. ¶¶ 47-

48).

## Alleged Duties Relating to IRA Accounts

In addition to appointing State Street as the custodian for their TAG-managed

investment accounts, Handal and other Class members appointed State Street as the

custodian and trustee of certain IRA accounts pursuant to Section 408 of the Internal

Revenue Code and regulations promulgated thereunder.  (Id. ¶ 34).  The plaintiffs claim

that in its capacity as a custodian and trustee for those accounts, Street State Street had

independent legal duties which arose under federal law.  (Id. ¶ 51). Specifically, the

plaintiffs allege that State Street had a fiduciary duty to acquire and hold investments

specified by the trust instrument, which in this case was State Street's standard contract that was entered into by all Class members who maintained IRA accounts. (Id. ¶¶ 53, 55). They also allege that the defendant had fiduciary duties to deposit assets from IRA accounts requiring safekeeping in an adequate vault; periodically determine and value the assets held by it in trust; receive, issue receipts for, and safely keep securities; maintain custody of investments; and, with the exception of investments pooled in a common investment fund pursuant to applicable Treasury regulations, refrain from commingling the investments of each account with other property. (Id. ¶ 55). The plaintiffs claim that State Street breached these duties, as well as other fiduciary duties that arose as a result of its custodial relationship with the plaintiffs and members of the proposed Class.

### TAG's Alleged Change in Investment Strategy

In 2007, during the time when the plaintiffs maintained TAG-managed custody accounts with State Street, Tagliaferri moved TAG's principal office from Stamford, Connecticut to St. Thomas in the Virgin Islands. (Id. ¶ 23). The plaintiffs allege that the Virgin Islands has been designated as a High Intensity Financial Crime Area ("HIFCA") by the United States Treasury Department's Office of Comptroller of the Currency, the agency which regulates national banks such as State Street. (Id.). They also allege that banks transacting business with clients in HIFCA are obligated to use a higher degree of care with respect to those clients and remain more attentive to the possibility of financial crimes. (Id.).

Prior to his move to the Virgin Islands, Tagliaferri had invested his customers' money in high-quality blue chip stocks and municipal bonds. (Id. ¶ 24). Indeed, the plaintiffs claim that they had sought him out as an investment advisor because of his conservative, low-risk investment strategy and his knowledge of the municipal bond market. (Id.). However, following TAG's transfer to the Virgin Islands in 2007, Tagiaferri, without the plaintiffs' knowledge or approval, began to invest his clients' funds in highly speculative stocks and notes of domestic and international micro-cap companies, and in personal loans and mortgages. (Id. ¶ 25). For example, TAG allegedly transferred the plaintiffs' conservative investments in municipal bonds and blue chip stocks into thinly traded and wildly fluctuating stocks such as the stock of Fund.com. (Id. ¶ 26). Although shares of Fund.com had been valued at $10/share, within about a year, the company was delisted and its share price fell to less than $.08 per share. (Id.). Similarly, the plaintiffs allege that TAG invested their funds in International Equine Acquisitions Holdings Inc. ("IEAH"), a horse-racing stable that was purportedly going to be established as an equine hedge fund for the purpose of financing purchases of thoroughbreds. (Id.). According to the plaintiffs, Tagliaferri was a board member of IEAH and TAG received secret kickbacks from the deal. (Id.). The plaintiffs later learned that the company's CEO also had a history of engaging in securities fraud. (Id.).

The plaintiffs claim that these and other suspicious, high risk and illiquid investments reflected a dramatic change in TAG's investment style, and that State Street was aware of this change due to its regular processing and settling of TAG's transactions.

(<u>Id.</u> ¶¶ 25-27).  However, instead of informing its custodial clients of TAG's suspicious

activities, State Street allegedly processed and settled TAG's irregular transactions, and

covered up TAG's deceptive conduct by listing false and misleading information on its

custodial clients' account statements.  (<u>See</u> <u>id.</u> ¶¶ 5, 7-8, 69, 79, 81-82, 84, 102).

### State Street's Alleged Misconduct

Although State Street had no responsibility for TAG's investment decisions, the

plaintiffs claim that it nevertheless acted with gross negligence and/or willful misconduct

in the course of conducting its custodial activities and in the preparation of the plaintiffs'

periodic account statements.  (<u>Id.</u> ¶ 56).  According to the plaintiffs, State Street's

conduct not only concealed the fraudulent investment practices employed by the

plaintiffs' investment manager, TAG, but it also resulted in millions of dollars in losses to

the plaintiffs and the proposed Class.  (<u>Id.</u> ¶¶ 8, 56).

### Alleged Use of Fake CUSIP Numbers

In accordance with its obligations under the Custody Account Agreements, State

Street prepared and disseminated monthly account statements for the plaintiffs and other

members of the proposed Class.  (<u>Id.</u> ¶ 57).  The account statements contained various

information relating to the customers' account holdings, including a number identified as

a "CUSIP" for each asset held in the account.  (<u>Id.</u>).  A CUSIP number is an alpha-

numeric code that is issued for securities by Standard & Poor's CUSIP Global Services

("CGS"), and allegedly provides a means for identifying legitimate securities.  (<u>See</u> <u>id.</u>

¶ 68).  Although State Street represented that the numbers on the account statements were

CUSIPs, many of those numbers were not actual CUSIPs, but rather were internal identifiers that had been created by State Street.  (Id. ¶¶ 59-61, 65; see also Def. Mem. (Docket No. 23) at 13-14).  However, the plaintiffs allege that State Street deliberately concealed the fact that the numbers it was using were fake and were not actual CUSIPs issued by the CGS CUSIP system.  (Id. ¶ 62).  Accordingly, they claim that State Street misled them into believing that the TAG-managed assets in their custodial accounts were legitimate when, in fact, they consisted of high risk, illiquid and unmarketable investments.  (Id. ¶¶ 63, 69-71).

Davies claims that she only learned about the fake CUSIP numbers in about March 2010, when she attempted to transfer custody of the Stone Family Trusts' assets from State Street to Wells Fargo.  (Id. ¶¶ 63-64).  In connection with her efforts to change custodians, Davies sent copies of the Trusts' account statements to Wells Fargo.  (Id. ¶ 64).  Within a few days thereafter a Wells Fargo representative allegedly called and informed her that he had serious concerns about the investments that TAG had made on behalf of the Trusts.  (Id.).  He also told Davies that he had checked the CUSIPs of the investments listed on the State Street statements, and had found that many of the securities were not marketable and the numbers were not actually CUSIPs.  (Id.).  Because most of the investments held in the Trusts' accounts lacked valid CUSIPs, the Wells Fargo representative allegedly informed Davies that he could not value the investments, and Wells Fargo could not accept transfer of those assets into its custody. (Id.).

Handal contends he first learned that the State Street account statements contained fake CUSIPs when he was researching facts in preparation for the instant litigation.  (Id. ¶ 66).  Like Davies, he allegedly had no reason to suspect that the information contained on the State Street account statements was inaccurate or untruthful.  (Id.).

The plaintiffs assert that State Street's misleading account statements gave the imprimatur of legitimacy to TAG's investment decisions, and allowed TAG to increase their holdings in unmarketable and unregistered investments while divesting their accounts of legitimate, low-risk products.  (Id. ¶ 69).  They contend that if State Street had exercised an appropriate standard of care, they would have been able to discover the true nature of the investments in their accounts and could have avoided some or all of the damages that they ultimately suffered. (Id. ¶ 71).

<u>Allegedly Improper Settlement and Reporting Activities</u>

The services that State Street provided to the plaintiffs included the execution and recording of account transactions.  (See id. ¶ 72, 74).  Thus, after TAG changed its investment strategy, it would instruct State Street to disburse funds from the plaintiffs' accounts for purchases of speculative stocks, notes, personal notes and mortgages.  (Id. ¶ 74).  State Street would then wire money out of the plaintiffs' accounts in accordance with TAG instructions, and report the transactions on the plaintiffs' account statements as investments that had been purchased.  (Id.).  The plaintiffs claim that State Street acted with gross negligence and/or willful misconduct, in derogation of its obligations under the

-15-

Custody Account Agreements, in the course of carrying out these activities.  (See id. ¶¶ 120, 125).

As an initial matter, the plaintiffs claim that on numerous occasions, State Street made disbursements from their accounts in exchange for obviously fake subordinated notes that purported to represent obligations of companies that were the makers of the notes, but were signed instead by TAG and Tagliaferri.  (Id. ¶¶ 75-76).  For example, but without limitation, State Street allegedly accepted a $60,000 subordinated note dated November 6, 2009 and entitled "M2 Systems Corporation 12% Secured Sub Note." (Compl. Ex. A at 1).  The document was signed by Tagliaferri and read as follows:

> FOR VALUE RECEIVED, TAG Virgin Islands, Inc. ("TAG"), as agent, promises to pay to Margot S. Handal Tr U/A 7/21/00 ("Payee") ... the principal amount of Sixty Thousand  ($60,000) Dollars in lawful money of the United States of America (the "Principal") upon payment by M2 Systems Corporation, a Florida corporation, with an address at 850 Trafalgar Court, Suite 100, Maitland, Florida 32751 ("Maker") of the note (the "Note") issued by Maker dated July 25, 2006 in the principal amount of Two Million Fifty Thousand ($2,050,000) Dollars and assigned to TAG, as agent for Payee among others.  The Note is due and payable by Maker on the Maturity Date as defined therein and bears interest (the "Interest") payable as provided therein, at the annual rate of twelve percent (12%), except as otherwise provided in the Note, until the Principal and all accrued Interest thereon are paid in full.  This Sub Note is secured as set forth in the Note.

(Id.).

The plaintiffs allege that this and other such subordinated notes represented nothing more than "IOUs" issued by TAG to the plaintiffs and other Class members, and were obviously fake on their face.  (Compl. ¶¶ 75-76).  They also contend that by

receiving and processing such documents, State Street became aware of TAG's deceptive conduct and the illegitimacy of these transactions.  (Id. ¶¶ 76, 78).  However, instead of notifying the plaintiffs as to the existence and suspicious nature of the subordinated notes, State Street allegedly settled the transactions and, for the most part, reported them on the plaintiffs' monthly account statements as though they were master notes reflecting promises to pay by company Makers of the notes rather than subordinated notes issued by TAG and Tagliaferri.  (Id. ¶¶ 78-79).  Thus, the plaintiffs claim that State Street misled them into believing that the subordinated notes constituted valuable assets when in reality they were worthless.  (See id. ¶ 102).

In addition to its alleged misconduct in executing and reporting on transactions involving fake subordinated notes, the plaintiffs claim that State Street purchased stock for their accounts, and listed such stock as investments on their account statements, without obtaining timely delivery of stock certificates.  (Id. ¶ 80).  Moreover, the plaintiffs claim that on numerous occasions, State Street disbursed funds from their accounts without ever receiving the purchased assets.  (Id. ¶ 81).  For instance, they contend that State Street authorized two separate cash disbursements from accounts held by the Stone Family Trusts to Bank of America for the purchase of UMS Partners Notes in the amount of $80,000 each.  (Id. ¶ 81).  However, the Trusts allegedly never received the Notes.  (Id.).

The plaintiffs further contend that in connection with its reporting activities, State Street misrepresented the market value of various notes that it listed on its clients'

account statements.  (Id. ¶¶ 82-83).  According to the plaintiffs, many of those notes had already matured and had therefore been in default on the date they were purchased, or remained in default for long periods of time following maturity.  (Id. ¶ 82).  Nevertheless, the fact that the notes were in default was not reflected in the valuations that State Street provided on the account statements.  (See id.).  The plaintiffs claim that State Street's failure to properly execute and settle various transactions, and its listing of improper valuations on its clients' account statements, breached the terms of the Custody Account Agreements and otherwise violated State Street's legal obligations as a custodian.  (Id. ¶ 84).

According to the plaintiffs, State Street's alleged misrepresentations regarding the market value of its clients' investments allowed the defendant to charge them excessive custodial fees.  (See id. ¶ 120(g)).  Allegedly, the fee that State Street charged for the TAG-managed custody accounts was based on a percentage of the value of the assets held by State Street in those accounts (typically five basis points), with a minimum charge of $800 per year.  (Id. ¶ 37).  Thus, by providing inflated valuations for the assets in those accounts, State Street was able to take excessive custodial fees from plaintiffs and other members of the Class.  (Id. ¶¶ 83, 102, 120(g)).

### Alleged Failure to Safeguard Assets and Monitor Subcustodians

Under the terms of the Custody Account Agreements between IBT and the plaintiffs, IBT (and State Street as its successor) was authorized to deposit the plaintiffs' property with a sub-custodian, which was defined as "a branch of another U.S. Bank, a

foreign bank acting as custodian or a foreign securities depository" in which IBT participated.  (Pl. Ex. A ¶¶ 1, 7).  Similarly, under the Custody Account Agreement between State Street and the Handal Trust, State Street was given discretion to appoint sub-custodians to carry out provisions of the Agreement.  (Pl. Ex. C at 12).  The plaintiffs claim that State Street engaged in gross negligence or willful misconduct in the selection and monitoring of sub-custodians that it designated to hold its clients' assets.  (See Compl. ¶¶ 90, 100).

In particular, the plaintiffs claim that State Street selected TAG as a sub-custodian to hold the assets of the plaintiffs and members of the proposed Class.  (Id. ¶ 90).  As described above, TAG did not fall within the definition of a "sub-custodian," and under SEC Rule 206(4)-2, investments advisor firms such as TAG are not permitted to hold their customers' funds or securities.   (See id. ¶¶ 42, 88).  Accordingly, the plaintiffs contend that State Street's alleged decision to deposit its clients' assets with TAG was improper.  (See id. ¶¶ 42, 90).

The plaintiffs also accuse State Street of failing to keep track of the location of assets that had been transferred to other sub-custodians.  (Id. ¶ 91).  In particular, they allege that State Street initially used the letter "R" on its clients' account statements to indicate that "some or all of this holding is not held in our custody."  (Id. ¶ 92 (emphasis omitted)).  According to the plaintiffs, such investments were held by a sub-custodian, but State Street had no knowledge as to where the assets were located.  (Id.).  They further allege that in February 2010, State Street suddenly changed the definition of the

"R" designation to mean "held at source."  (<u>Id.</u> ¶¶ 93-94).  As the defendant explained in

a February 2010 notice to its clients, assets described as "held at source" referred to:

> [a]ssets that [State Street] has agreed to reflect on your accounting
> statement at your request, but are not held in custody by [State
> Street].  Information provided on this account statement in
> connection with such held at source assets was not provided or
> verified for accuracy by State Street.  These assets are displayed for
> informational purposes only.  "R" indicates Held at Source.

(<u>Id.</u> ¶ 94 (emphasis omitted)).   The plaintiffs contend that State Street's abrupt change in

the meaning of the "R" designation illustrates the defendant's lack of knowledge

regarding the location of custodial assets and its failure to monitor its sub-custodians.

(<u>Id.</u> ¶ 95).

Davies alleges that she was not alerted to any of State Street's alleged misconduct

until after she attempted to transfer custody of the Stone Family Trusts' assets to Wells

Fargo in March 2010, and Handal alleges that he was not alerted to such wrongdoing

until 2011.  (<u>Id.</u> ¶¶ 104, 105).  They both claim that if State Street had not engaged in the

challenged actions they would have had an opportunity to dispose of the illegitimate

investments made by TAG and avoid the extensive losses that they experienced in their

accounts.  (<u>Id.</u> ¶ 103).

Additional factual details relevant to this court's analysis are described below

where appropriate.

## III.  ANALYSIS

By its motion to dismiss, State Street is seeking an order dismissing each Count of the complaint for failure to state a claim.  Although State Street has raised a myriad of arguments addressing each of the Counts individually, it has provided two grounds for dismissal which address the complaint in its entirety.  The first of those arguments is that the complaint fails to satisfy the pleading requirements of Fed. R. Civ. P. 8(a) because it offers too few specifics about State Street's alleged misconduct and fails to identify the specific transactions that the plaintiffs are seeking to challenge in this action.  (Def. Mem. (Docket No. 23) at 8).  The second global argument is that none of the plaintiffs' claims can survive because they are all precluded by the Securities Litigation Uniform Standards Act of 1998, 15 U.S.C. § 78bb(f) ("SLUSA").  For the reasons that follow, this court finds that the complaint easily satisfies the liberal pleading requirements of Rule 8(a), but that SLUSA mandates the dismissal of the plaintiffs' entire action.  Because this court concludes that SLUSA preemption is dispositive of all of the plaintiffs' claims, this court finds it unnecessary at this time to address the remaining arguments raised by State Street in its motion.

### A.    Standard of Review

State Street has moved to dismiss the plaintiffs' claims pursuant to Fed. R. Civ. P. 8(a) and 12(b)(6).  Rule 8(a) provides in relevant part that "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  "[T]he pleading standard Rule 8

announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964, 167 L. Ed. 2d 929 (2007)). Accordingly, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Id. (quoting Twombly, 550 U.S. at 555, 127 S. Ct. at 1965). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Id. (quoting Twombly, 550 U.S. at 557, 127 S. Ct. at 1966).

Motions to dismiss under Rule 12(b)(6) test the sufficiency of the pleadings. Thus, when confronted with a motion to dismiss, the court accepts as true all well-pleaded facts and draws all reasonable inferences in favor of the plaintiff. Cooperman, 171 F.3d at 46. Dismissal is only appropriate if the complaint, so viewed, fails to allege a "plausible entitlement to relief." Rodriguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 95 (1st Cir. 2007) (quoting Twombly, 550 U.S. at 559, 127 S. Ct. at 1967).

Two underlying principles must guide the court's assessment as to the adequacy of the pleadings to support a claim for relief. Maldonado v. Fontanes, 568 F.3d 263, 268 (1st Cir. 2009). "'First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.' Such conclusory statements are 'not entitled to the assumption of truth.'" Id. (quoting

-22-

Iqbal, 556 U.S. at 678, 129 S. Ct. at 1949) (internal citations omitted).  "'Second, only a complaint that states a plausible claim for relief survives a motion to dismiss.'"  Id. (quoting Iqbal, 556 U.S. at 679, 129 S. Ct. at 1949).  "This second principle recognizes that the court's assessment of the pleadings is 'context-specific,' requiring 'the reviewing court to draw on its judicial experience and common sense.'  '[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not show[n] – that the pleader is entitled to relief.'"  Id. (quoting Twombly, 556 U.S. at 679, 129 S. Ct. at 1950) (internal quotations and citation omitted; alterations in original).

### B.       Sufficiency of Allegations Under Rule 8(a)

The defendant argues, as an initial matter, that the complaint should be dismissed for failure to comply with Fed. R. Civ. P. 8(a).  Specifically, State Street asserts that the allegations are insufficient because the plaintiffs provide few specifics regarding the alleged misconduct, and lump together all accounts and the separate Custody Account Agreements governing them.  It also argues that the plaintiffs' failure to identify any challenged transaction in any particular account has left it up to State Street "to devine in which account and under which account agreement the challenged transactions are alleged to have occurred."  (Def. Mem. (Docket No. 23) at 8).  However, this court finds that the plaintiffs' allegations are more than adequate to meet the liberal notice pleading requirements of Rule 8(a)(2).

"The purpose of the notice pleading requirements set forth in Fed. R. Civ. P. 8(a) is to 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" Phelps v. Local 0222, No. 09-11218-JLT, 2010 WL 3342031, at *5 (D. Mass. Aug. 20, 2010) (quoting Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512, 122 S. Ct. 992, 998, 152 L. Ed. 2d 1 (2002) (quotations and citations omitted)).  In addition, the pleadings "must afford the defendants a meaningful opportunity to mount a defense." Benyamin v. Commonwealth Med. UMass Med. Ctr., Inc., No. 11-40126-FDS, 2011 WL 2681195, at *2 (D. Mass. July 6, 2011) (quoting Diaz-Rivera v. Rivera-Rodriguez, 377 F.3d 119, 123 (1st Cir. 2004) (internal punctuation and additional citations omitted)). Thus, at a minimum, "the complaint should at least set forth minimal facts as to who did what to whom, when, where, and why." Id. (quoting Educadores Puertorriquenos en Accion v. Hernandez, 367 F.3d 61, 68 (1st Cir. 2004).  "While a court may dismiss a pleading that does not comply with the notice pleading requirements of Rule 8, the exercise of this power is generally reserved for a pleading that is 'so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if  any, is well disguised.'" Black v. UNUMProvident Corp., 245 F. Supp. 2d 194, 197 (D. Me. 2003) (quoting Simmons v. Abruzzo, 49 F.3d 83, 86 (2d Cir. 1995)).  The complaint at issue here is not one of those pleadings.

Although the plaintiffs have not described every transaction in which State Street allegedly violated the terms of the Custody Agreements or otherwise engaged in miscon-duct, they have alleged a pattern and practice of behavior involving all TAG-managed

custody accounts held by State Street dating back to 2007.  Moreover, they have

described the contractual basis for their claim that State Street owed them certain duties

of care, and have alleged facts detailing the specific types of activities that resulted in

alleged breaches of those duties or otherwise gave rise to their claims.  Furthermore, the

plaintiffs have provided specific examples of State Street's allegedly unlawful conduct

based on its handling of their own accounts, and they have even suggested a motive for

State Street's alleged misconduct: the defendant's interest in collecting custodial fees

from holders of TAG-managed custody accounts.  As evidenced by the extensive

arguments raised by the defendant in its motion to dismiss, this is more than enough to

notify State Street as to the nature of the plaintiffs' claims and the grounds upon which

those claims rest, and to enable State Street to mount a defense.  No more is needed in

order to meet the liberal notice pleading standard set forth in Fed. R. Civ. P. 8(a).

### C.      Preemption Under the Securities Litigation Uniform Standards Act

State Street also contends that all of the plaintiffs' claims are barred by SLUSA.

"Congress passed SLUSA to prohibit plaintiffs from suing in state court or under state

law merely to circumvent the more stringent procedural and substantive requirements

placed on securities claims under the Private Securities Litigation Reform Act of 1995

['PSLRA'.]"  Weitman v. Tutor, 588 F. Supp. 2d 133, 136 (D. Mass. 2008).  "By raising

the bar for securities fraud lawsuits, the PSLRA had the unintended consequence of

steering plaintiffs to state court, where they sought to avoid the PSLRA by reformulating

their allegations as state common law claims."  In re Beacon Assocs. Litig., 745 F. Supp.

2d 386, 429 (S.D.N.Y. 2010). "SLUSA was intended to reverse that trend by forbidding plaintiffs from filing certain types of class actions in state court" or under state law. Id. This court finds that the state law claims asserted by the plaintiffs in this action are precluded by SLUSA and therefore must be dismissed.

### Elements of SLUSA

SLUSA provides in relevant part that

> [n]o covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging –
>
> (A)    a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or
>
> (B)    that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.

15 U.S.C. § 78bb(f)(1). Accordingly, SLUSA preemption[5] requires a showing of four separate elements: "(1) the suit must be a 'covered class action'; (2) the action must be based on state or local law; (3) the action must concern a 'covered security'; and (4) the defendant must have misrepresented or omitted a material fact or employed a manipulative or deceptive device or contrivance 'in connection with the purchase or sale' of that security." In re Beacon Assocs. Litig., 745 F. Supp. 2d at 429. "[A]s long as

---

[5] Although courts, including the Supreme Court, speak in terms of SLUSA preemption, "SLUSA does not actually pre-empt any state cause of action. It simply denies plaintiffs the right to use the class-action device to vindicate certain claims. The Act does not deny any individual plaintiff, or indeed any group of fewer than 50 plaintiffs, the right to enforce any state-law cause of action that may exist." Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 87, 126 S. Ct. 1503, 1514, 164 L. Ed. 2d 179 (2006).

claims meet all the elements of SLUSA, courts have generally held that SLUSA precludes those claims – regardless of how artfully or cleverly plaintiffs attempt to plead them."[6] Anderson v. Merrill Lynch Pierce Fenner & Smith, Inc., 521 F.3d 1278, 1286 (10th Cir. 2008).  See also Rowinski v. Salomon Smith Barney Inc., 398 F.3d 294, 299-304 (3d Cir. 2005) (holding that SLUSA preempted action asserting state law claims for breach of contract, unjust enrichment, and violation of state consumer protection law).  The plaintiffs' allegations in the instant case demonstrate that each of these elements has been satisfied.

### Application of SLUSA to the Instant Case

The plaintiffs do not dispute that the Consolidated Class Action Complaint describes a covered class action, which is defined as "a lawsuit in which damages are sought on behalf of more than 50 people."  Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 85, 126 S. Ct. 1503, 1513, 164 L. Ed. 2d 179 (2006).  As the

---

[6]  The plaintiffs argue in a footnote that their claims fall outside SLUSA's scope because they all sound in contract and tort, and do not allege fraud. (See Pl. Opp. Mem. at 30 n.22).  The First Circuit has "repeatedly held that arguments raised only in a footnote or in a perfunctory manner are waived."  Nat'l Foreign Trade Council v. Natsios, 181 F.3d 38, 60 n.17 (1st Cir. 1999).  In any event, as this court has discussed above, the very purpose of SLUSA was to preclude class action plaintiffs from asserting certain state law claims involving material misrepresentations or omissions made in connection with the purchase or sale of covered securities or claims that the defendant used a "manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security."  The type of claim asserted is not controlling, and the fact that the plaintiffs' claims do not allege fraud does not remove them from SLUSA's reach.  See, e.g., Anderson v. Merrill Lynch Pierce Fenner & Smith, Inc., 521 F. 3d 1278, 1280, 1288 (10th Cir. 2008) (holding that SLUSA precluded plaintiffs' claims, which consisted of fourteen separate counts brought under New Mexico law, and citing cases that have dismissed breach of contract and tort claims).

plaintiffs have alleged in their complaint, they have brought the present action on behalf of themselves and on behalf of "at least 50 members of the class" of individuals who maintained TAG-managed custodial accounts at State Street. (See Compl. ¶¶ 1, 108). Therefore, the first element of the test for SLUSA preemption has been satisfied.

Nor is there any question that the second element of the test has been met as well. As indicated above, the plaintiffs have asserted common law claims for breach of contract, gross negligence, violations of Mass. Gen. Laws ch. 93A, negligent misrepresentation, breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, and unjust enrichment.  (See id. at Counts I-VII).  Accordingly, all of the claims in this action are based on state law rather than federal law.

With respect to the final two elements of SLUSA, the plaintiffs do not contest that they have alleged misrepresentations and omissions of material fact by the defendant, or that they have relied on those alleged misrepresentations and omissions to support each of their claims in this action.  Thus, for example, the plaintiffs have alleged that State Street knew TAG was engaged in a widespread deception, but concealed that knowledge from the plaintiffs and members of the proposed Class.  (See id. ¶¶ 7, 77-79).  Additionally, the plaintiffs have repeatedly alleged that State Street issued monthly account statements to its clients on which it listed fake CUSIP numbers, provided inaccurate descriptions and valuations of investments in its custody, and listed assets that were illegitimate or that State Street had never actually received.  (See, e.g., id. ¶¶ 6, 59-62, 69-71, 79, 82-84). Moreover, all of the Counts contained in the complaint incorporate these allegations by

reference, and some or all of these allegations have been alleged specifically in support of the plaintiffs' substantive claims.[7]  See Anderson, 521 F.3d at 1287 (finding misrepresentation requirement satisfied where substantive counts incorporated allegations of misrepresentations by reference and several of the individual counts alleged misrepresentations or omissions); Rowinski, 398 F.3d at 300 (finding misrepresentation requirement of SLUSA satisfied where complaint contained allegations regarding defendant's materially misleading statements, and allegations were "incorporated by reference in every count in the complaint").  Therefore, the misrepresentation requirement has been met in this case, and the question whether SLUSA bars the entire action turns on whether State Street's alleged misrepresentations and omissions occurred in connection with the purchase or sale of a covered security.  Under the relevant case law, that question must be answered in the affirmative.

### "In Connection with the Purchase or Sale" Element

"The subject statute does not define what is meant by 'in connection with the purchase or sale of a covered security' but the United States Supreme Court has interpreted the phrase broadly such that 'it is enough that the fraud alleged coincide with a securities transaction'."  Weitman, 588 F. Supp. 2d at 138 (quoting Dabit, 547 U.S. at 85,

---

[7]  The plaintiffs readily admit that "the essence" of their complaint "concerns allegations that State Street failed to inform Plaintiffs that they were invested in a substantial amount of illegitimate or otherwise worthless investments" when the plaintiffs believed they were invested in conservative, low-risk investments such as blue chip stocks and municipal bonds.  (See Pl. Opp. Mem. (Docket No. 26) at 29; Compl. ¶¶ 24-25, 69).

126 S. Ct. 1503) (additional quotations omitted).  The "coincide" requirement also is construed broadly.  See Backus v. Connecticut Comty. Bank, 789 F. Supp. 2d 292, 302 (D. Conn. 2011).  It is met "when claims 'turn on injuries caused by acting on misleading investment advice – that is, where plaintiff's claims necessarily allege, necessarily involve, or rest on the purchase or sale of securities.'"  Id. (quoting Romano v. Kazacos, 609 F.3d 512, 522 (2d Cir. 2010)) (additional quotations and citation omitted).  As the relevant case law makes clear, in order to meet this element of SLUSA, it is not necessary for the defendant to show that it was the entity which selected the investments or exe-cuted the purchases and sales of securities.  See, e.g., id. at 306 (finding that custodian's misrepresentations were in connection with the purchase or sale of securities where third party purported to buy and sell securities with plaintiffs' funds).  "The requisite showing, in other words, is deception in connection with the purchase or sale of any security, not deception of an identifiable purchaser or seller."[8]  Dabit, 547 U.S. at 85, 126 S. Ct. at 1513 (quotations and citation omitted).   See also Scala v. Citicorp Inc., No. C 10-03859 CRB, 2011 WL 900297, at *7 (N.D. Cal. Mar. 15, 2011) ("As Dabit makes clear, it is immaterial that the Defendants are neither the purchasers nor sellers of the security").

---

[8] Because the defendants' ability to satisfy the "in connection with" element of SLUSA does not depend on the identity of the purchaser or seller, the plaintiffs' argument (again raised only in a footnote) that they did not rely on State Street for investment advice or for the purchase and sale of securities, is insufficient to defeat SLUSA preemption.  (See Pl. Opp. Mem. at 30 n.22).

In the instant case, the plaintiffs' claims against State Street coincide with the purchase and sale of securities.  The plaintiffs allege that State Street's role as custodian was to hold funds and assets that were to be used for the purpose of purchasing securities. See Backus, 789 F. Supp. 2d at 306 (finding that custodian's misrepresentations occurred in connection with the purchase and sale of securities where the purpose of the custodial relationship was the investment of plaintiffs' assets in securities by a third party); Mandelbaum v. Fiserv, Inc., 787 F. Supp. 2d 1226, 1247 (D. Colo. 2011) (finding that trustees' alleged conduct in failing to safeguard plaintiffs' retirement accounts from theft by third party ponzi schemer, Bernard Madoff, was connected to the purchase and sale of securities where "the parties' relationship served the purpose of trading securities"). They also allege that State Street misled them about the nature of the transactions that it was carrying out at TAG's direction, which transactions included purchases and sales of securities, and that State Street's alleged misrepresentations and omissions induced them to maintain their investment accounts, which ultimately resulted in significant financial losses.  See Backus, 789 F. Supp. 2d at 305 (finding that custodian's misrepresentations regarding the value of investments in plaintiffs' accounts, and its false assurances that it was holding and safeguarding plaintiffs' assets from potential misfeasance by third party investment manager were made in connection with the purchase and sale of securities). Accordingly, this court finds that State Street's alleged misrepresentations and omissions were in connection with the purchase and sale of securities.

### The "Covered" Security Element

The plaintiffs argue that even if all the other elements of SLUSA are met, preemption would not be appropriate because the investments at issue do not include "covered" securities.  (Pl. Opp. Mem. at 29-30).  Under SLUSA a "covered security" is one traded nationally and listed on a regulated national exchange."  <u>Dabit</u>, 547 U.S. at 83, 126 S. Ct. at 1512.  The plaintiffs contend that "the essence" of their complaint "concerns allegations that State Street failed to inform Plaintiffs that they were invested in a substantial amount of illegitimate or otherwise worthless investments, none of which were recognized on any national securities exchange."  (Pl. Opp. Mem.  at 29).  However, "[i]f a covered class action brought under state law concerns a transaction involving covered securities at all, it is subject to dismissal under SLUSA – even if it also involves non-covered securities or non-securities."  <u>Scala</u>, 2011 WL 900297, at *4; <u>see also</u> <u>Lasley v. New England Variable Life Ins. Co.</u>, 126 F. Supp. 2d 1236, 1238-39 (N.D. Cal. 2000) (finding that SLUSA applied where action involved both variable life insurance policies, which are covered securities under SLUSA, and ordinary life insurance policies, which are not covered securities under SLUSA).  While the plaintiffs' claims concern allegations that the defendants' conduct allowed TAG to invest their assets in non-covered securities, the complaint contains facts showing that State Street's alleged misconduct also occurred in connection with the purchase and sale of covered securities.

As an initial matter, the plaintiffs have alleged that State Street's misconduct deceived them into believing that TAG was continuing to follow its original strategy of investing in municipal bonds and blue chip stocks when in fact TAG was divesting the

plaintiffs' accounts of legitimate securities and increasing their investments in unregis-

tered securities.  (See Compl. ¶¶ 24-26, 69).  For purposes of SLUSA, it is enough that

the plaintiffs believed their assets were being used to purchase and sell covered securities,

even if no such trades were taking place.  See Backus, 789 F. Supp. 2d at 307 (finding

that alleged deception involved covered securities where no such securities were

purchased, but "the relationship between Plaintiffs and their custodians . . . was formed

for the purpose of placing Plaintiffs' funds with [an investment manager] for investment

in covered securities"); Mandelbaum, 787 F. Supp. 2d at 1246 ("For SLUSA purposes,

deception is deemed to have occurred 'in connection with the purchase or sale of any

security' even if a security was not actually purchased, provided the plaintiff had

submitted funds to the defendant with the understanding that such funds would be used to

purchase securities"); In re Beacon Assocs. Litig., 745 F. Supp. 2d at 393, 430 (finding

that plaintiffs alleged a misrepresentation or omission in connection with the purchase or

sale of a covered security where parties' stated objective was to invest plaintiffs' funds in

stocks listed on the Standard & Poor's 100 index, even though no such investments ever

took place).  Thus, the plaintiffs' expectation that their investments would include the

purchase and sale of blue chip stocks satisfies the "covered security" element of SLUSA.

    In any event, the plaintiffs have alleged facts showing that the defendant's alleged

misrepresentations and omissions concerned actual purchases and sales of covered

securities.  In particular, as indicated above, the plaintiffs have alleged that State Street's

misleading and deceptive monthly account statements "allowed TAG to increase

Plaintiffs' and Class Members' holdings in unmarketable, unregistered, and illegitimate investments while it divested of the legitimate securities in conservative and low-risk investments." (Compl. ¶ 69).  Because those "legitimate securities" included blue chip stocks (see id. ¶ 24), the plaintiffs have alleged that State Street's misconduct occurred in connection with the sale of covered securities.  Additionally, the plaintiffs have alleged that the "illegitimate" investments which were made for their accounts included thinly traded stocks such as Fund.com, a stock that was valued at about $10 per share in 2011, but "has since been delisted and is worth less than .08/share." (Id. ¶ 26).  The fact that Fund.com was ultimately delisted demonstrates that it was listed on a national securities exchange at the time TAG purchased it on the plaintiffs' behalf.  Therefore, the plaintiffs have alleged that TAG's purchases included "covered" securities within the meaning of SLUSA.

The plaintiffs' reliance on Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 750 F. Supp. 2d 450 (S.D.N.Y. 2010), does not alter this court's conclusion that SLUSA bars the present action.  In that case, the court ruled that the plaintiffs' state law claims were not preempted because the misrepresentations at issue concerned the valuation and performance of certain hedge funds, which were not covered securities.  Pension Comm., 750 F. Supp. 2d at 452-55.  In connection with its ruling, the court rejected the defendants' argument in favor of SLUSA preemption on the ground that a portion of the hedge funds' portfolios included covered securities.  Id. at 455.  It found that SLUSA was inapplicable "because the alleged fraud relates to those

hedge funds rather than to the covered securities in the portfolios." Id.  However, the

court expressly distinguished the facts of that case from cases in which a plaintiff

deposited money in a bank account managed by a trustee "who then made allegedly

misleading statements regarding the trustee's use of the plaintiff's money to purchase,

sell, or hold *covered* securities." Id. at 456.

The circumstances alleged by the plaintiffs in this case fall within the description

of the cases that the Pension Committee court found distinguishable.  Here, the plaintiffs

deposited their funds in custodial accounts at a bank, and now allege that the custodian

made materially misleading statements and omissions that led the plaintiffs to believe

their funds were being used to invest in covered securities when in fact they were not.

See Backus, 789 F. Supp. 2d at 307 (finding that allegations by custodial account holders,

"that the custodian misrepresented the extent to which it was holding securities purchased

by an investment manager with their funds, fit[ ] within the type of scenario *Pension

Comm.* found distinguishable").  Accordingly, Pension Committee does not support the

denial of State Street's motion to dismiss.[9]

## IV.  **CONCLUSION**

For all the reasons detailed herein, this court recommends to the District Judge to

whom this case is assigned that "Defendant State Street Bank and Trust Company's

---

[9]  This court also has considered the other cases cited by the plaintiffs in their opposition, and has found them to be factually distinguishable from the facts presented here.  Therefore, none of the cases relied on by the plaintiffs indicates that SLUSA should not apply.

Motion to Dismiss Plaintiff's Complaint" (Docket No. 22) be ALLOWED without

prejudice.[10]


        / s / Judith Gail Dein
        Judith Gail Dein
        U.S. Magistrate Judge

---

[10] The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-605 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 153-54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985). Accord Phinney v. Wentworth Douglas Hosp., 199 F.3d 1, 3-4 (1st Cir. 1999); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir. 1994); Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 4 (1st Cir. 1998).